IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 1:23-CR-302-RAH-KFP |
| | ) | |
| LEIGHTON JERRELL TAYLOR | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

Before the Court is Defendant Leighton Jerrell Taylor's Motion to Suppress (Doc. 20), which the Government opposes (Doc. 27). The Court held an evidentiary hearing on January 4, 2024. Upon consideration of the testimony presented at the hearing, the evidentiary submissions, and the parties' arguments, the undersigned recommends Taylor's motion be DENIED for the reasons below.

## I.    INTRODUCTION

This case involves two law enforcement searches at 1202 Imperial Drive, Dothan, Alabama, but Taylor's motion challenges only the first search of the home.[1] During the first search inside the home, law enforcement discovered, in plain sight, a digital scale and a large bag filled with a green substance that was presumptively marijuana. Law enforcement did not seize anything at that time. Instead, they exited the residence and secured a search warrant. The warrantless initial search is at issue here.

---

[1] A third search was performed on a vehicle at the residence, but that search is not challenged.

## II.    FINDINGS OF FACT[2]

Early on the morning of May 27, 2022, law enforcement was dispatched to 1202 Imperial Drive, Dothan, Alabama, in response to an edged weapon/domestic violence call. Gov't Ex. 2; Tr. 45:10–17. Upon arrival, Dothan Police Department criminal investigator Michael Hannon learned from an officer on the scene that Taylor had driven himself to Flowers Hospital after suffering an injury during an altercation with Brittany Kincey, Taylor's wife. Tr. 45:10–22, 47:2–5. Hannon attempted to make contact with anyone who might be inside the residence, but no one answered him from within the residence. Tr. 46:1–11, 56:12–15. He did not find any blood or weapons on the scene outside the home. He did not find any sign of forced entry at the entrance to the home. Tr. 46:12–15. After Hannon was informed that the altercation took place at the back of the home, he inspected the rear of the property, finding no blood or weapon there. Tr. 46:12–18.

Hannon left the residence and went to Flowers Hospital. Tr. 46:1–47:7. There, he met with Taylor and learned that Kincey used a kitchen knife to stab Taylor in the neck during an argument between them inside the home in the kitchen. Tr. 48:8–49:3. Taylor required three stitches for his injury. Tr. 68:3–11. At the hospital, Hannon met Taylor's grandmother, Mattie Taylor, who was there with him along with a juvenile Hannon believed to be another grandson. Tr. 47:22–48:3. Although Taylor did not wish to pursue

---

[2] Defendant's motion is riddled with factual statements that found no support in the evidentiary record before the Court. Although he was given a deadline to file a reply brief after the Government filed its opposition, which pointed out many of the factual discrepancies and laid out the legal argument for the search, Defendant filed no reply brief. The Court makes its findings of fact based on the evidentiary record before it. Exhibit 1 is a portion of the body-camera video of Officer Justin Money, which recorded the search at issue. Exhibit 2 is the search warrant secured after the plain view discovery of (presumptive) drugs. Additionally, before the Court is the testimony of Officer Justin Money and Investigator Michael Hannon.

charges against Kincey, Hannon determined that he needed to speak with Kincey because the incident was one of domestic violence involving assault with a knife. Accordingly, Hannon put out a BOLO (be on the lookout) for Kincey. Tr. 48:24–49:3.

Later in the day and in response to the BOLO, Dothan Police Department Officers Tyler Elliott and Justin Money, who were assigned to patrol, went to the Imperial Drive residence to attempt contact with Kincey, whose whereabouts were still unknown. Tr. 8:16–9:3, 26:25–27:2. They arrived around 8:00–8:30 a.m. that morning. Tr. 9:4–9. No other officers or individuals were present when they arrived. Tr. 25:19–23; Gov't Ex. 1. Officer Money's body-camera video captured the events there. Ex. 1.

Upon their approach to the front door, Officers Elliott and Money discovered blood on the front door and on the ground in front of the door. Ex. 1 at 0:48–1:00; Tr. 9:22–10:10, 17:3–8. It also appeared that the front door had been forcibly opened because they found the doorframe broken and the front door came ajar when Officer Money knocked on it. Ex. 1 at 1:00–1:17; Tr. 9:22–10, 10:22–29. No one answered the knocks on the door. Tr. 35:5–6. The officers stepped away from the front door to make some calls. Ex. 1 at 1:29–1:56; Tr. 10:11–13, 17:6–24.

When they went back to their patrol vehicles to make calls, a vehicle pulled into the driveway of the Imperial Drive residence.  Ex. 1 6:53–7:26; Tr. 11:20–12:14. When the officers approached the driver, they met Taylor's grandmother, Mattie Taylor, in the driver's seat and also saw a male juvenile in the passenger seat. Ex. 1 at 7:28–54. Mattie informed the officers that the home belongs to Taylor's "grandaddy," who was not there because he was sick, and that Taylor and his wife rent the property. Ex. 1 at 7:43–7:46,

8:14–48; *see also* Tr. 75:3–8. Officer Money asked Mattie if she came to the residence "for something," and Mattie responded, "Yeah. I come to check the house and lock it up." Ex. 1 at 07:48–54. Mattie also advised she was there to retrieve money from inside the home that belonged to her—money that Taylor collected at a business he helped Mattie with. Tr. 12:17–19, 28:7–29:4. Officer Money advised her that no one could go inside yet because they were waiting on the arrival of the investigator. Ex. 1 at 7:54–8:05.

Officer Money talked with his sergeant to relay their findings and get direction as to how to proceed. Tr. 10:11–18; Ex. 1 at 8:56–12:48. The sergeant requested the officers wait for Investigator Hannon to return and let him determine how to proceed. Ex. 1 at 10:48–55. The officers can be heard on the video considering whether someone could be inside the home hurt, including Kincey. Ex. 1 at 10:02–52. The officers were aware that Taylor had been "nicked" by a knife during the domestic dispute, but they questioned whether the blood on the front door and on the ground in front of the door could be Taylor's given what they knew of the altercation. *Id.*; Tr. 10:22–25; *see also* 14:17–19, 34:22–25. The sergeant instructed that, unless they heard someone calling out from inside in need of help, they were to wait for the investigator's return to evaluate the scene and determine how to proceed. Ex. 1 at 11:00–24. During the call, Officer Money informed the sergeant that Mattie was present, and the sergeant questioned whether she had authority to go inside. Officer Money responded with something to the effect of, "not that I know of" and relayed that Mattie told them the home was Taylor's grandaddy's and they (Taylor and Kincey) rent it. Ex. 1 at 11:33–53. Officer Money relayed to the sergeant that Mattie was there to lock-up the house. Ex. 1 at 12:19–23. Again, the sergeant reiterated that they should await

the arrival of the investigator, and the sergeant suggested the investigator might be able to determine if Mattie had authority to go inside. Ex. 1 at 12:27–40.

When Officer Elliot contacted Hannon, the investigator advised the officers that he would return to the scene, and Hannon indicated to them that there was no blood at the front door when he was previously at the scene that morning. Tr. 11:1–10, 49:6–25. When Hannon arrived about 20 minutes later, Mattie confirmed to him that the home was Taylor's grandaddy's, and she shared her belief that no one remained inside the house. Ex. 1 at 21:30–51, 22:06–09; Tr. 18:24–19:3, 59:25–60:5. Hannon understood that the residence was owned by Willie Carroll, whom he understood from Mattie to be the grandfather she mentioned, and Hannon also understood that Taylor and Kincey lived there some of the time.[3] Tr. 61:2–62:4. Hannon understood that because "grandaddy" was sick, Mattie was overseeing the property and had a key to the property. Tr. 75:3–8. Twice Hannon is heard on the body-camera video asking Mattie if law enforcement could go inside. The first time, Hannon asks (as best the Court can make out):

> Would you be okay and it's okay if not . . . would you be okay, and we'll go with you . . . be okay if we were allowed to walk and make sure there's nobody . . . no blood or weapons in there like the knife. . . . Okay with you if we walk through and saw it?

Ex. 1 at 21:53–22:04; Tr. 51:3–7, 51:19–23. There is no discernable response from Mattie to the request to go inside, but she does indicate her belief that Kincey is not inside because she has talked to Kincey on the phone. Ex. 1 at 22:05–09; *see* Tr. 29:20–30:8. Hannon

---

[3] There is some discussion between Hannon and Mattie that indicates Taylor and Kincey lived some period of time in Atlanta as well. *See* Ex. 1 at 23:53–24:18; Tr. 58:19–24; *see also* Ex. 2 (noting that Taylor informed Hannon he and his wife were in town for the weekend).

asked whether Mattie knew if Kincey was hurt because "a bunch of blood" was on the door and the door was "bashed in." Ex. 1 at 23:09–37; *see also* 13:44–56, 21:30–48. Hannon again asked Mattie if the house belongs to her. She reiterated that it was Taylor's grandaddy's house. Ex. 1 at 25:00–14. Hannon again raised the subject of going inside the house. He asked Mattie, "Well, would you mind? Would you mind walking in there with us? Would that be okay?" Mattie cannot be clearly heard on the video,[4] but Hannon responded to her saying, "Well, thank you." Hannon then stated, "I just want to be sure no one is in there and they're not hurt." Ex. 1 at 25:34–25:44. He informed her that Officer Money would record with his body-camera, and "we will go together . . . and maybe we might find that kitchen knife that she used." Ex. 1 at 25:34–26:02; *see* Tr. 40:19–41:13, 67:7–25, 68:15–22, 72:13–23. Mattie exited the vehicle and walked toward the front door.

At the hearing, Officer Money and Investigator Hannon credibly testified that they thought Mattie had keys in her hand, and it looked like she planned to use them to open or unlock the front door. Tr. 19:8–10, 60:10–24, 70:25–71:7, 75:1–8. Mattie has keys in her hand in the video as she approaches the front door. Ex. 1 at 26:45–52. Keys were, however, unnecessary to gain entry because of the broken doorframe. As Investigator Hannon approached the front door, he noted that "blood is everywhere," and he noted the blood on the busted front door and on the ground in front of it. Ex. 1 at 26:20–45. Hannon photographed the blood and commented that these findings were different than the condition of house when he was previously on the scene earlier that morning. Ex. 1 at 26:20–45; *see* Tr. 71:2–7. Mattie was the first person who walked over the threshold into

---

[4] The Court understands her response as something to the effect of "Yeah, I guess so." Ex. 1 at 25:37–40.

the home, and she was followed by Investigator Hannon, Officer Money, and Officer Elliot.[5] Ex. 1 at 26:46–27:13. Officer Money testified they followed Mattie inside "to make sure nobody else was inside and potentially to locate the knife like Investigator Hannon asked." Tr. 34:22–35:1. But, Officer Money acknowledged no one had answered the earlier knocks on the door and that none of the investigators called out to see if anyone would respond as they entered the house. Tr. 34:22–35:14, 38:18–39:13.

Once inside, Mattie led everyone to the kitchen. Ex. 1 at 26:52–27:22. The officers noted blood on the ground as they made their way there. *Id*. Once in the kitchen, Hannon identified and photographed the kitchen knife that he believed was used against Taylor, which he located in the sink. Ex. 1 at 26:52–38. Mattie then led the officers down the hallway where the bedrooms and a bathroom were located. *Id*. at 27:54–28:13. As the officers followed her, they glanced from the hallway into each room and used a flashlight; they also pointed out the blood they observed. Ex. 1 at 27:54–28:17; *see* Tr. 13:4–9, 51:3–23. As they approached the end of the hallway, Mattie entered the bedroom on the left and Officer Money followed her; she sat down on a couch in the bedroom. Ex. 1 at 28:13–39. On the floor of the bedroom in plain sight next to where Mattie was seated, Officer Money saw a large plastic bag containing a green substance consistent with the appearance of marijuana. Ex. 1 at 28:34–39; Tr. 13:4–14:5. When Officer Money saw it, he called for Investigator Hannon. Ex. 1 at 28:29–40; Tr. 20:16–21.[6] Officer Money also saw in plain sight a digital scale next to where Mattie was sitting. Tr. 13:10–14. Hannon entered the

---

[5] The juvenile male who was in the car with Mattie also accompanied them inside.

[6] Officer Money also observed a suitcase in the room that was unzipped with a plastic bag hanging out of it. He pulled back the top of the open suitcase and said, "pounds right there." Ex. 1. At 28:56–29:03.

room and, upon seeing the substance, exclaimed, "Oh my goodness alive!" Ex. 1 at 28:38–42. Then, Hannon directed that the house be cleared of everyone. Ex. 1 at 28:40–29:32; Tr. 21:5–10.

After the house was cleared, it was held so no one could enter, and Investigator Hannon took steps to secure a search warrant for the residence. Tr. 21:5–23, 52:14–25. Ex. 2. According to the Government, execution of the search warrant, which is not challenged here, yielded recovery of 10.3 pounds of marijuana, 13 ounces of methamphetamine, 12 grams of cocaine, 10 Loratab pills, several multi-colored pills (positive for ecstasy), 13 ounces of an unknown white powder, and a DPMS .556 caliber AR-15, which records show as stolen. *See* Tr. 22:15–23:1, 54:13–23; Doc. 27 at 4.

## III.   LEGAL STANDARD

The warrantless search of a home is "presumptively unreasonable" under the Fourth Amendment. *United States v. Davis*, 313 F.3d 1300, 1302 (11th Cir. 2002) (internal quotation marks omitted). To rebut this presumption, the government must show both probable cause and an exception to the warrant requirement. *Id*.

Additionally, the prohibition against warrantless searches does not apply where the government secures valid consent for the search. *United States v. Matlock*, 415 U.S. 164 (1974). The burden of establishing the requisite common authority or apparent authority rests on the government. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). The "determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Id*. at 188 (quoting *Terry*

*v. Ohio*, 392 U.S. 1, 21–22 (1968)) (internal quotation marks omitted); *United States v. Mercer*, 541 F.3d 1070, 1074 (11th Cir. 2008) (same). "[A] warrantless entry is valid when based upon the consent of a third party whom the police, at the time of entry, reasonably believed possessed common authority over the premises, even if the third party does not in fact possess such authority." *United States v. Fernandez*, 58 F.3d 593, 598 (11th Cir. 1995) ("In this case, it is undisputed that Fernandez represented to the law enforcement officers that Granger had authority over the trailer. Accordingly, it was reasonable for the officers to conclude that Granger had the authority to consent to a search of the trailer, and we need not decide whether Granger did, in fact, possess common authority over the trailer.").

## IV.   DISCUSSION

The Government argues that the Dothan law enforcement officers had consent to enter the Imperial Drive home and their actions were consistent with that consent. Additionally, the Government argues that even if they did not have consent, exigent circumstances and probable cause supported their entry into the home. Taylor claims Mattie did not have authority (apparent or actual) to consent, so the officers were not authorized to enter the home. He further contends there was no probable cause and no exigency to support a warrantless search. Because the Court finds the officers entered with proper consent and had probable cause and exigent circumstances to search the home even in the absence of consent, the Motion to Suppress should be denied.

### A. Consent to Enter

Under the Fourth Amendment, a warrantless search is unreasonable unless it falls within one of the carefully delineated exceptions. One exception exists when officers

obtain valid consent to search. While a property owner has actual authority to consent to a search of his home, consent need not be given directly by the property owner to secure constitutional compliance.

In *United States v. Matlock*, 415 U.S. 164 (1974), the Supreme Court recognized that consent may be given by a third party where the consent is voluntary and the third party possesses "common authority over or other sufficient relationship to the premises . . . sought to be [entered]." *Id.* at 169–71. "The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements . . . , but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* at 171 n.7. "'[C]ommon authority' rests 'on mutual use of the property by persons generally having joint access or control for most purposes.'" *Rodriguez*, 497 U.S. at 181.

Common authority may be either actual or apparent. *Id.* at 185–189. In the absence of actual authority, a search does not violate the Fourth Amendment if law enforcement has an objectively reasonable, good faith belief that the consenting individual had authority to consent. In other words, a warrantless search is not invalid where the consent comes from a third party whom the police, at the time of entry, reasonably believed possessed authority over the premises. *Mercer*, 541 F.3d at 1074 (citing *Rodriguez*, 497 U.S. 177)

### 1. Mattie Taylor had apparent authority to consent.

Evaluating authority is a fact-intensive inquiry. The facts in this case are unique. The parties have not cited, and the Court has not located, any case factually on-point. Here, the consenting party, Mattie, was not a homeowner; she was not a co-occupant; and she was not a tenant. She is a third party whose authority, if any, arose from common authority she shared with the homeowner and renter or from an objectively reasonable, good faith belief in her apparent authority.

Taylor appears to rely entirely on the fact that "grandaddy," and not Mattie, owned the home as a basis to invalidate her consent. The Government argues she was a keyholder, so she had authority. Neither argument prevails through such a narrow scope because the totality of the circumstances must be considered in analyzing consent. *See Smith v. LePage*, No. 1:12-CV-0740-AT, 2015 WL 13260394, at *9 (N.D. Ga. Mar. 31, 2015), *aff'd*, 834 F.3d 1285 (11th Cir. 2016) ("While no authority in this Circuit compels the Court to conclude that Bigham possessed the actual authority to consent to entry into the Smiths' residence once Dirk Smith had returned home, based on the totality of the circumstances in the record the Court can easily conclude that Officers Reynolds and Ings reasonably believed he possessed the authority to provide consent."). As discussed below, a review of all the circumstances supports a finding that the officers had an objectively reasonable, good faith belief that Mattie had authority over the property to grant their entry.

Mattie made clear to the officers upon her arrival that she was not the property owner. However, Mattie's actions and communications to the officers led them to believe she was a keyholder of the property with authority over it. Indicative of that authority,

Mattie presented keys at the front door of the house after agreeing to go inside with the officers. The officers credibly testified that they believed she planned to use a key to gain entry into the home (or to lock it when leaving), albeit no key was necessary given the damage to the front door. She told the officers she was there, in part, to lock-up the home, which reasonably suggests she had a key to do so. Mattie did not indicate any limitation on her authority over the home. She could go inside and throughout the house to retrieve her money that Taylor stored for her there and to check the property in its entirety. She presented nothing to the officers suggesting she was limited, for instance, to checking on a particular room, limited as to when she entered the home, limited as to how frequently she came by to check and secure it, or limited as to how long she stayed at the home while there. All these facts suggest a level of mutual use of the property.

Additionally, Mattie did not have limited access, for example, to only a locked storage room or interior closet that might suggest a narrower scope to her authority limited to a particular space, and none of the bedroom doors were shut or locked when they entered the home. *See United States v. Ervin*, 517 F. App'x 734, 739 (11th Cir. 2013) ("Anthony lived in a house on the same property as the shed, he had access to and keys to open the shed, and he stored his own firearms in the same area with [defendant's] firearms. Based on these facts, Anthony had common authority to consent to the search because he had joint access or control over the area for most purposes . . . . Regardless, under the circumstances, Deputy Karle reasonably relied on Anthony's apparent authority to consent.") (citation omitted); *United States v. Perdue*, No. 1:19-CR-78-RDP-GMB, 2019 WL 3501523, at *8 (N.D. Ala. Aug. 1, 2019) (finding valid authority of homeowner to give

consent to search bedroom occupied by defendant guest where "there is no evidence indicating that Defendant asserted exclusive ownership or control of the second bedroom, such that [homeowner] did not have common authority over the area . . . . [and] when [the detective] began his search for Defendant, he found the door to the second bedroom left wide open for anyone to access") (citing *United States v. Walker*, No. 1:06-CR-446TWT, 2007 WL 1341111, at *8 (N.D. Ga. May 1, 2007) (noting that an open door implies the defendant did not assert exclusive control over the searched area)). Additionally, there was nothing suggesting to the officers that Mattie was precluded from engaging others to help her check on the property through her common authority over it—whether family, friend, or law enforcement. In fact, Mattie came to the residence with another person, a juvenile. The juvenile entered the property with her.[7]

According to the credible evidence before the Court, Mattie had authority to enter the home, check it without limitation, retrieve money from inside, and secure it. When the additional facts are considered with her credited keyholder status, the Court concludes that Mattie had apparent authority over the property and that the officers had an objectively reasonable, good faith belief that she had authority to grant their access to the house. *See Hughes v. Coconut Creek Police Dep't*, 233 F. App'x 919, 922 (11th Cir. 2007) (no Fourth Amendment violation where officer had an objectively reasonable good-faith belief that he had obtained valid consent from the defendant's father, who represented that he owned the trailer, to search the bedroom and where there was no evidence bedroom door was locked); *United States v. Sanford*, 3:06-CR-199-MEF-CSC, 2009 WL 2197373, at *4 (M.D. Ala.

---

[7] The record does not make clear where or with whom the juvenile resided.

2009) (adopting recommendation of Magistrate Judge finding valid search based on officers' objectively reasonable, good faith belief that defendant's mother had authority to consent to search where property searched was located near her home, she told law enforcement the property belonged to "her and her family," and she indicated on consent form that she was "the owner or a person in charge of the . . . premises to be searched") (citing *United States v. Mathis*, 96 F.3d 1577, 1584 (11th Cir. 1996) (officers had an objectively reasonable belief that defendant's mother had authority to consent to search detached garage next to her house); *see also Iron Wing v. United States*, 34 F.3d 662 (8th Cir. 1994) ("We do not accept Iron Wing's argument that a key is necessary to establish authority over the premises. Here, Loretta was living at the house and she told police so. She corroborated this statement by her familiarity with the house and the fact that she knew she had left her bedroom window unlocked. The conclusion that Loretta had authority to consent to the search was easily as reasonable. . . .").

Consequently, Mattie's apparent authority was sufficient to support a constitutionally-sound search. Because she had apparent authority to consent to the search, the Court need not decide whether she had the actual authority to do so. *United States v. Barber*, 777 F.3d 1303, 1306 (11th Cir. 2015) ("The officers could have reasonably believed Robinson had common authority over the bag. And because Robinson had apparent authority to consent to the search, we need not decide whether he had actual authority to do so.").

## 2.  Mattie Taylor gave her consent voluntarily.

Consent is voluntarily given when it is a free and unconstrained choice. This is a factual inquiry based on the totality of the circumstances. *United States v. Spivey*, 861 F.3d 1207, 1212 (11th Cir. 2017). Taylor does not appear to challenge the voluntariness of Mattie's consent. The facts here do not suggest any coercive police procedures that might support a finding that consent was not voluntary. Instead, Mattie was instructed that she had the ability to decline consent when law enforcement requested her consent to enter the home. She was not being held in custody or intimidated in any way by law enforcement. There are no facts on which the Court could conclude her consent was anything less than voluntarily given.

## B.  Exigent Circumstances and Probable Cause

Exigent circumstances can also provide a basis for a warrantless search, consistent with the Fourth Amendment, where "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Bailey v. Swindell*, 89 F.4th 1324 (11th Cir. 2024) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (quoting *McDonald v. United States*, 335 U.S. 451, 456 (1948)) and citing *Payton v. New York*, 445 U.S. 573, 590 (1980) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.")). For example, an officer "may enter a home without a warrant to render emergency assistance to an injured occupant[,] to protect an occupant from imminent injury, or to ensure his own safety." *Id.* (quoting *Lange v. California*, 141 S. Ct. 2011, 2017 (2021) (quoting *Brigham*

*City, Utah v. Stuart*, 547 U.S. 398, 403 (2006))) (internal quotations omitted). Along with exigent circumstances, law enforcement must have probable cause to make a warrantless search constitutionally sound. *McClish v. Nugent*, 483 F.3d 1231, 1242 (11th Cir. 2007). The most urgent of the exigent circumstances is "the need to protect or preserve life" in an emergency situation. *United States v. Holloway*, 290 F.3d 1331, 1334–35 (11th Cir. 2002). The Government bears the burden of demonstrating that an exception to the warrant requirement applies, and that burden is heavy. *See Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984) ("[T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify [a] warrantless search[.]").

The Government argues that law enforcement had probable cause to believe someone could be inside the home in need of help based on the blood on the front door and on the ground in front of the front door along with the condition of the broken door frame and the unconfirmed whereabouts and condition of Kincey. These circumstances, the Government says, supported the exigency to enter the house without a warrant to render aid to a potentially injured person.

In response, Taylor argues there was no probable cause and no basis to believe someone could be inside injured to support exigency. He contends the officers' lack of immediate action negates any finding of exigency. Taylor appears to argue the officers did not really believe there was potentially someone in need of help because they waited 20 minutes or so for Hannon to arrive back at the scene and continued waiting while Hannon talked to Mattie before finally entering the home. Taylor also relies on the fact that, when they entered the house, the officers did not call out for anyone to answer. While the officers'

actions measured against a stopwatch might be viewed as lacking urgency or suggesting they were not really concerned about an injury, this will not fell the finding of exigency; the totality of the circumstances must be considered.

Taylor's focus on the timing of the search and the officers' intent also overlooks that the officers' subjective intent is not determinative. Instead, the analysis is objective. "This 'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises. It requires only 'an objectively reasonably basis for believing[]' that 'a person within [the house] is in need of immediate aid.'" *Michigan v. Fisher*, 558 U.S. 45, 48 (2009) (internal citations omitted) (reversing where lower court "replace[d] that objective inquiry into appearances with its hindsight determination that there was in fact no emergency" where "it was reasonable to believe that [an individual nonfatally hurt himself] and needed treatment . . . [or] was about to hurt, or had already hurt, someone else"); *compare United States v. Garcia*, No. 12-11994, 2013 WL 10509665, at *2–3 (11th Cir. June 6, 2013) (no exigent circumstances to support warrantless search when totality of circumstances showed police took over half an hour to respond to property crime committed several hours earlier, they had no indication of violence or potential harm or danger to a person, they had no indication of involvement of weapons, the only observed damage was to a fence 60 yards from the home, and there was evidence someone had recently been inside home). That the officers here did not immediately go inside upon discovery of the condition of the home's entrance or delayed entry because they thought they should or could get consent will not, on these facts,

preclude a finding of an objectively reasonable basis supporting exigent circumstances based on the totality of the facts presented.

Certainly, the circumstances here do not reflect the typical and more obvious basis for finding exigent circumstances, and the timing of the officers' entry a little more than 25 minutes after discovering the condition at the front of the home[8] makes this a closer call. But, the inquiry is a case specific, factual inquiry. *See Lange*, 141 S. Ct. at 2018 ("Our cases have generally applied the exigent-circumstances exception on a case-by-case basis. . . . The exception requires a court to examine whether an emergency justified a warrantless search in each particular case.") (quotations and citations omitted). The officers here were not conducting a warrantless search in connection with a 911 call related to violence. *United States v. Dabrezil*, 603 F. App'x 756, 759 (11th Cir. 2015) (approving a warrantless entry into an apartment when a resident called 911 to report injuries and request rescue). The officers were not conducting a warrantless search in connection with reports of gunshots. *United States v. Holloway*, 290 F.3d 1331, 1337–38 (11th Cir. 2002) (emergency situations involving endangerment to life fall within the exigent circumstances exception; police officer conducted a warrantless search of a house in response to 911 calls reporting gunshots and fighting inside the house). The officers were not conducting a warrantless search in response to observing a fight and seeing someone injured. *Brigham City*, 547 U.S. at 403 (officer observed juvenile punch adult resulting in a bloody lip). The absence

---

[8] Officer Hannon arrived about 20 minutes after Officers Money and Elliott first arrived on the scene, and Mattie Taylor walked into the home leading the search at 26:52 into Officer's Money's body-camera recording at the scene. Ex. 1.

of these circumstances, however, does not preclude a finding of exigency based on the totality of the circumstances the officers confronted.

Here, the officers did find the presence of new blood—blood that had not been there when Hannon originally responded to the domestic violence call earlier that day. The officers did find evidence of forced entry. The door was not previously in that condition when the scene was first investigated that morning. The officers had the alleged victim of the domestic violence incident in custody;[9] however, the alleged perpetrator—wife, Kincey—was still unaccounted for, and they were unable to confirm her condition to be certain that she, too, had not been injured during the domestic violence altercation. Tr. 72:13–23. Mattie Taylor reported to officers that Kincey was not inside, because she had spoken to her on the telephone and believed Kincey left the residence two hours earlier. *See* Ex. 1 at 13:56–14:03. The officers did not have independent confirmation of this. Investigator Hannon testified that he will "trust but verify" this type of information. Tr. 73:4–13.[10] Mattie could not or would not get Kincey on the phone for Hannon to talk with her. Ex. 1 at 22:29–23:05.

The officers, therefore, could not verify Kincey's whereabouts or her condition based simply on Mattie's report that she had talked with Kincey sometime after the altercation and before officers arrived back to the scene. The patrol officers—Money and Elliott—were instructed to wait for Hannon; only Hannon could confirm the condition at the front of the house as different from the earlier investigation. Once Hannon arrived back,

---

[9] Taylor was placed in custody while at the hospital due to an outstanding warrant. Tr. 24:3–9, 48:4–7.

[10] Taylor had reported to Hannon during their discussion at the hospital that Kincey was "'probably on her way back to Atlanta.'" This, too, was unconfirmed. Tr. 58:19–59:3.

the officers knew the following: Kincey was unaccounted for, no one answered from inside, and there was new evidence of blood on the door and on the floor in front of the door, along with the new condition of the door having been forcibly breached since the early morning investigation. *See* Ex. 1 at 23:08–37. From the time Hannon arrived back at the house until they entered the home to conduct the search, fewer than ten minutes elapsed. *See* Ex. 1 at 19:45 (Hannon seen back at the property) and 26:52 (Mattie leads the officers inside). Given the combination of these facts, it was objectively reasonable for law enforcement to believe someone, including Kincey, could be inside, hurt and unresponsive. *See Holloway*, 290 F.3d at 1338 ("[I]n an emergency, the probable cause element may be satisfied where officers reasonably believe a person is in danger."). Indeed, under these circumstances, it would arguably be unreasonable for officers to find a smashed door with newly tainted blood and not go in to check for an individual who could be injured, unresponsive, and in need of aid. *See United States v. Black*, No. 1:12-CR-16-RWS, 2013 WL 3814273, at *1 (N.D. Ga. July 22, 2013) (adopting report and recommendation of Magistrate Judge denying motion to suppress related to warrantless search and noting that, "[n]ot only was it reasonable for the officers to enter the locked room [after observing a kicked-in front door and a large puddle of blood, along with a shotgun, spent shell casings, and two gunshot would victims], it would arguably have been unreasonable for them not to"); *compare United States v. Turner*, No. 2:17-CR-478-WKW, 2018 WL 1702956, at *5 (M.D. Ala. Mar. 9, 2018), *report and recommendation adopted,* No. 2:17-CR-478-WKW, 2018 WL 1701322 (M.D. Ala. Apr. 6, 2018) (no exigent circumstances to justify warrantless search where officers could not have objectively reasonable belief someone was seriously injured

and in need of emergency aid where they knew potential gunshot victim was unharmed and outside apartment, they knew the other person reported to have been inside apartment was also outside the apartment unharmed, and they had "no other indications that a serious injury had occurred—i.e., the officers did not observe blood on the scene or hear anyone's cries for help").

On consideration of the totality of these facts, law enforcement could reasonably believe a crime had been committed and that someone could be inside in need of aid, and their warrantless entry does not offend the Fourth Amendment because of these exigent circumstances.

### C.  Exigent Circumstances to Prevent Destruction of Evidence

Exigent circumstances may also support a warrantless entry where it is done "to prevent the imminent destruction of evidence.'" *Bringham City*, 547 U.S. at 403. The Government mentions this evidence-destruction ground in passing in the opposition brief as one of many possible grounds for a finding under the exigent-circumstances doctrine. Doc. 27 at 7–9 (citing, *inter alia*, *Holloway*, 290 F.3d at 1334 (noting that the exigent-circumstances doctrine extends to situations involving "danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit")). The Government makes no argument in its brief that the officers here entered the home lawfully on that basis.[11] Similarly, in passing at the hearing, the Government argued exigent circumstances to prevent destruction of evidence. Tr. 79:3–12.

---

[11] The Government also mentions that "[t]he need to invoke the exigent circumstances exception to the warrant requirement is particularly compelling in narcotics cases because narcotics can be so easily and

Because the Court has found the warrantless search was legally sound for other reasons and because this argument was not fully developed, the Court declines to address it.

## V.     CONCLUSION

Accordingly, for the reasons set forth above, the Magistrate Judge RECOMMENDS that Taylor's Motion to Suppress (Doc. 20) be DENIED.

It is further ORDERED that by **February 22, 2024**, the parties may file written objections to this Recommendation. An objecting party must identify the specific portion of the factual findings or legal conclusions to which the objection is made and must describe in detail the basis for the objection. Frivolous, conclusive, or general objections will not be considered. The Recommendation is not a final order and, therefore, is not appealable.

Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with 28 U.S.C. § 636(b)(1) will bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waive the right of the party to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except on grounds of plain error or manifest injustice. *See* 11th Cir. R. 3-1.

---

quickly destroyed," but it fails to connect that general premise to this case. Doc. 27 at 8 (citing *United States v. Reid*, 69 F.3d 1109 (11th Cir. 1995); *United States v. Young*, 909 F.2d 442 (11th Cir. 1990); *United States v. Ramos*, 933 F.2d 968 (11th Cir. 1991); *United States v. Tobin*, 923 F.2d 1506 (11th Cir. 1991); *United States v. Rodgers*, 924 F.2d 219 (11th Cir. 1991)).

DONE this 8th day of February, 2024.

/s/ Kelly Fitzgerald Pate
KELLY FITZGERALD PATE
UNITED STATES MAGISTRATE JUDGE